# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**LEONA ARCHULETA,**

      **Plaintiff,**

    **vs.**                                      **Civ. No. 16-1042 KK**

**NANCY A. BERRYHILL,**[1]
**Acting Commissioner of Social Security,**

      **Defendant.**

## MEMORANDUM OPINION AND ORDER[2]

**THIS MATTER** is before the Court on the Social Security Administrative Record (Doc. 13) filed February 7, 2017, in support of Plaintiff Leona Archuleta's ("Plaintiff") Complaint (Doc. 1) seeking review of the decision of Defendant Nancy A. Berryhill, Acting Commissioner of the Social Security Administration, ("Defendant" or "Commissioner") denying Plaintiff's claim for Title XVI supplemental security income benefits. On April 17, 2017, Plaintiff filed her Motion to Reverse and Remand for Rehearing With Supporting Memorandum ("Motion"). (Doc. 18.) The Commissioner filed a Response in opposition on June 16, 2017 (Doc. 21), and Plaintiff filed a Reply on June 30, 2017. (Doc. 23.) The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c). Having meticulously reviewed the entire record and the applicable law and being fully advised in the premises, the Court finds the Motion is not well taken and is **DENIED.**

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Nancy A. Berryhill is substituted for Carolyn Colvin as the Acting Commissioner of the Social Security Administration. Fed. R. Civ. P. 25(d).

[2] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings, and to enter an order of judgment, in this case. (Docs. 4, 8, 9.)

# I.  Background and Procedural Record

Claimant Leona Archuleta ("Ms. Archuleta") alleges that she became disabled on October 4, 2007, at the age of twenty-three because of degenerative joint disease of the lumbar spine with complications, headaches (TMJ), major depression, anxiety, irritable bowel syndrome, fibromyalgia, cognitive problems with special education history, status-post multiple surgeries, and chronic pain.  (Tr. 344, 477.[3])  Ms. Archuleta completed the twelfth grade in 2004,[4] and worked for approximately three months in late 2006 early 2007[5] as a cashier and shelf stocker in the liquor department at Walgreens.  (Tr. 314-16, 499, 509.)  Ms. Archuleta reported she stopped working on October 4, 2007, due to her medical conditions.[6]  (Tr. 499.)

On November 29, 2012, Ms. Archuleta protectively filed an application for Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381 et seq.    (Tr. 477-78, 494.)  Ms. Archuleta's application was initially denied on March 22, 2013.  (Tr. 343, 344-60, 384-87.)  It was denied again at reconsideration on September 24, 2013.  (Tr. 361-78, 379, 393-97.)  On November 13, 2013, Ms. Archuleta requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. 400.)  The ALJ conducted a hearing on March 5, 2015.  (Tr. 308-42.)  Ms. Archuleta appeared in person at the hearing with non-attorney representative Nicki Kinley.[7]  (*Id.*)  The ALJ took testimony from Ms. Archuleta (Tr. 314-35), and an impartial vocational

---

[3] Citations to "Tr." are to the Transcript of the Administrative Record (Doc. 13) that was lodged with the Court on February 7, 2017.

[4] Ms. Archuleta reported to Dr. Paula Hughson that she dropped out of school in ninth grade and was homeschooled until graduation.  (Tr. 882.)  She testified that her highest level of education was a "high school diploma."  (Tr. 320.)

[5] Ms. Archuleta reported to a field officer that she worked as a cashier from January 2006 to October 2007.  (Tr. 500, 508.)

[6] Ms. Archuleta testified that the primary reason she stopped working at Walgreens was because of a robbery incident at the store that shook her up.  (Tr. 318.)  She further testified that she sought work after leaving Walgreens until 2008 but was never hired.  (Tr. 318-19.)  She testified that her she had "a lot of surgeries" in 2008 and everything started getting worse that then prevented her from seeking work.  (*Id.*)

[7] Ms. Archuleta is represented in this proceeding by Michael Armstrong and William Rode.  (Doc. 1.)

expert ("VE"), Pamela Bowman (Tr. 335-41). On April 24, 2015, ALJ Eric Weiss issued an unfavorable decision. (Tr. 288-302.) On July 21, 2016, the Appeals Council issued its decision denying Ms. Archuleta's request for review and upholding the ALJ's final decision. (Tr. 1-7.) On September 20, 2016, Ms. Archuleta timely filed a Complaint seeking judicial review of the Commissioner's final decision. (Doc. 1.)

## II. Applicable Law

### A. Disability Determination Process

An individual is considered disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (pertaining to disability insurance benefits); *see also* 42 U.S.C. § 1382(a)(3)(A) (pertaining to supplemental security income disability benefits for adult individuals). The Social Security Commissioner has adopted the familiar five-step sequential analysis to determine whether a person satisfies the statutory criteria as follows:

(1)    At step one, the ALJ must determine whether the claimant is engaged in "substantial gainful activity."[8] If the claimant is engaged in substantial gainful activity, she is not disabled regardless of her medical condition.

(2)    At step two, the ALJ must determine the severity of the claimed physical or mental impairment(s). If the claimant does not have an impairment(s) or combination of impairments that is severe and meets the duration requirement, she is not disabled.

(3)    At step three, the ALJ must determine whether a claimant's impairment(s) meets or equals in severity one of the listings described in Appendix 1 of

---

[8] Substantial work activity is work activity that involves doing significant physical or mental activities. 20 C.F.R. §§ 404.1572(a), 416.972(a). Work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before. *Id.* Gainful work activity is work activity that you do for pay or profit. 20 C.F.R. §§ 404.1572(b), 416.972(b).

the regulations and meets the duration requirement. If so, a claimant is presumed disabled.

(4)     If, however, the claimant's impairments do not meet or equal in severity one of the listing described in Appendix 1 of the regulations, the ALJ must determine at step four whether the claimant can perform her "past relevant work." Answering this question involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ considers all of the relevant medical and other evidence and determines what is "the most [claimant] can still do despite [her physical and mental] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). This is called the claimant's residual functional capacity ("RFC"). *Id.* §§ 404.1545(a)(3), 416.945(a)(3). Second, the ALJ determines the physical and mental demands of claimant's past work. Third, the ALJ determines whether, given claimant's RFC, the claimant is capable of meeting those demands. A claimant who is capable of returning to past relevant work is not disabled.

(5)     If the claimant does not have the RFC to perform her past relevant work, the Commissioner, at step five, must show that the claimant is able to perform other work in the national economy, considering the claimant's RFC, age, education, and work experience. If the Commissioner is unable to make that showing, the claimant is deemed disabled. If, however, the Commissioner is able to make the required showing, the claimant is deemed not disabled.

*See* 20 C.F.R. § 404.1520(a)(4) (disability insurance benefits); 20 C.F.R. § 416.920(a)(4) (supplemental security income disability benefits); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). The claimant has the initial burden of establishing a disability in the first four steps of this analysis. *Bowen v. Yuckert*, 482 U.S. 137, 146, n.5, 107 S.Ct. 2287, 2294, n. 5, 96 L.Ed.2d 119 (1987). The burden shifts to the Commissioner at step five to show that the claimant is capable of performing work in the national economy. *Id.* A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Serv.*, 933 F.2d 799, 801 (10th Cir. 1991).

**B.**    **Standard of Review**

This Court must affirm the Commissioner's denial of social security benefits unless (1) the decision is not supported by "substantial evidence" or (2) the ALJ did not apply the proper legal standards in reaching the decision. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Casias,* 933 F.2d at 800-01. In making these determinations, the Court "neither reweigh[s] the evidence nor substitute[s] [its] judgment for that of the agency.'" *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008). A decision is based on substantial evidence where it is supported by "relevant evidence . . . a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118. A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley,* 373 F.3d at 1118, or "constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992). The agency decision must "provide this court with a sufficient basis to determine that appropriate legal principles have been followed." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005). Therefore, although an ALJ is not required to discuss every piece of evidence, "the record must demonstrate that the ALJ considered all of the evidence," and "the [ALJ's] reasons for finding a claimant not disabled" must be "articulated with sufficient particularity." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).

### III. Analysis

The ALJ made his decision that Ms. Archuleta was not disabled at step five of the sequential evaluation. (Tr. 301-02.) Specifically, the ALJ found that Ms. Archuleta had not

engaged in substantial gainful activity since her application date of November 29, 2012,[9] and had severe impairments of somatization disorder, anxiety disorder, depression, obsessive compulsive disorder, fibromyalgia, left sacroiliac joint syndrome, greater tronchanteric bursitis on the left, degenerative disc disease of the lumbar spine with lumbar facet syndrome, lumbosacral spondylosis without myelopathy, spinal stenosis of the lumbar region without claudication, and flexor tenosynovitis in both hands. (Tr. 293.) The ALJ found that Ms. Archuleta had nonsevere impairments of irritable bowel syndrome, obstructive sleep apnea, headaches, obesity, gastro-esophageal reflux disease, and temporomandibular joint dysfunction. (*Id.*) The ALJ, however, determined that Ms. Archuleta's impairments did not meet or equal in severity one the listings described in Appendix 1 of the regulations. (Tr. 295.) As a result, the ALJ proceeded to step four and found that Ms. Archuleta had the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except

> she could lift 10 pounds occasionally and could lift and carry at most a negligible amount frequently; she could at most occasionally climb ramps and stairs, balance, stoop, crouch, kneel, and crawl, but could never climb ladders, ropes and scaffolds; she must avoid more than occasional exposure to extreme cold, vibration, and workplace hazards such as dangerous moving machinery and unprotected heights; and she is limited to performing simple, routine tasks with few if any workplace changes.

(Tr. 298.) The ALJ further concluded at step four that Ms. Archuleta had no past relevant work. (Tr. 300.) The ALJ determined at step five that based on Ms. Archuleta's age, education, work experience, RFC, and the testimony of the VE, that there were jobs that exist in significant numbers in the national economy that Ms. Archuleta could perform. (Tr. 301-02.)

Ms. Archuleta asserts several arguments in support of her Motion as follows: (1) the ALJ failed to provide proper reasons for rejecting State agency examining psychological consultant

---

[9] There is no retroactivity for Title XVI payments. Therefore, the earliest possible established onset date in a Title XVI claim is the application filing date or protective filing date. *See* POMS DI 25501.370.A.1. – *The Established Onset Date for Title XVI Claims.*

Dr. Paula Hughson's opinion regarding her ability to do work-related mental activities; (2) the ALJ erred by failing to account for all of the moderate limitations found by State agency nonexamining psychological consultants Donald Gucker, Ph.D. and Ralph Robinowitz, Ph.D.; (3) the ALJ's step-five findings are not supported by substantial evidence because (i) the VE testimony regarding the number of jobs in the national economy is not reliable, and (ii) there is a conflict between the ALJ's RFC and the reasoning level requirement for the job of charge account clerk; and (4) the ALJ impermissibly evaluated Ms. Archuleta's character instead of her symptoms. (Doc. 18 at 11-24.) The Court finds no reversible error as discussed below.

### A. State Agency Examining Psychological Consultant Paula Hughson, M.D.

The record indicates that the Administration ordered a psychiatric mental status exam to establish Ms. Archuleta's mental functioning since she had not sought treatment for any mental impairment. (Tr. 358.) Thus, on March 18, 2013, Ms. Archuleta presented to Paula Hughson, M.D., for a consultative psychiatric examination. (Tr. 880-85.)

Ms. Archuleta reported to Dr. Hughson that her chief complaint was "degenerative disc disease and fibromyalgia, and a lot of other things." (*Id.*) Dr. Hughson noted Ms. Archuleta's reported psychiatric problems[10] as follows:

> Began noticing increased anxiety about three years ago. Often becomes anxious anticipating that she will not be able to fall asleep. On a good night she sleeps for five to six hours Often she naps during the day. Feels high anxiety on "bad days." Describes obsessive ordering rituals dating back to childhood. Was also obsessive about her schoolwork, had to check and recheck things multiple times. Has been on Citalopram for two months. She had negative side effects with other psychotropic medications, but cannot say their names. Says her doctor has "mentioned possible referral to mental health but she is too busy with medical appointments as it is."

---

[10] Dr. Hughson also noted Ms. Archuleta's reported physical problems that included, *inter alia*, her complaints of constant back pain and fatigue. (Tr. 881.)

(Tr. 881.)  Ms. Archuleta reported she had never seen a mental health professional or had any psychiatric hospitalizations.  (Tr. 882.)  She stated she required some assistance with her activities of daily living and that her mother and daughter helped her with the care of the house.  (*Id.*)  She said she had friends, but mostly interacts with her family.  (*Id.*)  She stated she gets along very well with others.  (*Id.*)

On mental status exam, Dr. Hughson noted that Ms. Archuleta was alert; oriented to date, day, month, year, season, person, place and situation; was able to repeat three words with recall at five minutes; she correctly completed five serial seven subtractions; her affect was congruent and she smiled frequently; her mood was anxious; her thought process linear; her thought content relevant; her estimated intelligence and fund of information was low average; her insight was limited; and her judgment was fair.  (Tr. 882-83.)  Dr. Hughson noted that Ms. Archuleta had no homicidal or suicidal ideation, no hallucinations, and no delusions.  (Tr. 882.)  Dr. Hughson's Axis I diagnoses were somatization disorder and obsessive compulsive disorder.  (Tr. 883.)  Dr. Hughson assessed a GAF score of 48.[11]   Dr. Hughson explained that Ms. Archuleta had excessive limiting symptoms in multiple systems absent organic findings, which is characteristic of somatization disorder.  (*Id.*)  She also explained that Ms. Archuleta's attitude and affect appeared incongruous with her degree of limitation, and that her lack of emotional insight was typical of psychosomatic disorders.  (*Id.*)

Dr. Hughson completed a *Statement of Opinion of Abilities (Psychiatric Only)* and assessed that Ms. Archuleta had *no limitations* in (1) understanding and remembering very short and simple instructions; (2) interacting with coworkers and supervisors; and (3) being aware of

---

[11] The GAF is a subjective determination based on a scale of 100 to 1 of "clinician's judgment of the individual's overall level of functioning."  *Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* (4th ed. 2000) at 32.  GAF score of 41-50 indicates serious symptoms (*e.g.,* suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  *Id.* at 34.

normal hazards in the workplace and reacting appropriately. (Tr. 884.) She assessed that Ms. Archuleta had *mild limitations* in (1) understanding and remembering detailed or complex instructions and (2) interacting with the public. (*Id.*) Finally, she assessed that Ms. Archuleta had *moderate limitations* in (1) carrying out instructions; (2) attending and concentrating; (3) working without supervision; (4) adapting to changes in the workplace; and (4) using public transportation or traveling to unfamiliar places. (*Id.*)

The ALJ accorded moderate weight to Dr. Hughson's opinions and explained that "[a]lthough not inconsistent with the findings here, this statement makes no use of vocationally relevant terms, and is not informed by the greater variety of evidence that was available for review by the state agency consultants. It is therefore considered to be of lesser probative value." (Tr. 299.) Ms. Archuleta argues that the ALJ's explanation for "rejecting" Dr. Hughson's psychiatric assessment is "facially dubious and too vague" because it is unclear what ALJ Weiss meant by "vocationally relevant terms." (Doc. 18 at 13-14.) Ms. Archuleta further argues that Dr. Hughson "conducted her evaluation at the request of DDS in the required format, and used the forms provided by DDS when making her assessment." (*Id.* at 13.) The Commissioner contends that the ALJ did not "reject" Dr. Hughson's opinion, but concluded it was entitled to moderate weight. (Doc. 21 at 9.) The Commissioner further contends that the ALJ reasonably observed that Dr. Hughson did not translate her limitations into "vocationally relevant terms," or actual RFC restrictions, and this was a valid reason to give her opinion slightly less weight. (*Id.* at 10.) The Commissioner asserts that the ALJ correctly observed that Dr. Hughson did not review any records, but that the State agency nonexamining psychological consultants had access to all of Ms. Archuleta's medical records at the time of their reviews. (*Id.* at 10-11.)

"An ALJ must evaluate every medical opinion in the record, although the weight given each opinion will vary according to the relationship between the disability claimant and the medical professional." *Hamlin*, 365 F.3d at 1215. Specifically, when assessing a claimant's RFC, an ALJ must explain what weight is assigned to each opinion and why. SSR 96-5p, 1996 WL 374183 at *5.[12] "An ALJ must also consider a series of specific factors in determining what weight to give any medical opinion." *Hamlin*, 365 F.3d at 1215 (citing *Goatcher v. United States Dep't of Health & Human Servs.*, 52 F.3d 288, 290 (10th Cir. 1995)).[13] An ALJ need not articulate every factor. *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). Generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a non-examining consultant is given the least weight of all. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). Ultimately, ALJs are required to weigh medical source opinions and to provide "appropriate *explanations* for accepting or rejecting such opinions." SSR 96-5p, 1996 WL 374183 at *5 (emphasis added); *see Keyes-Zachary v Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012) (citing 20 C.F.R. § 416.927(e)(2)(ii))).

The ALJ provided appropriate explanations for the weight he accorded Dr. Hughson's opinion. As an initial matter, the ALJ did not *reject* Dr. Hughson's assessment as Plaintiff argues, but instead evaluated it and accorded it moderate weight. In so doing, the ALJ accurately noted that Dr. Hughson's assessment was not expressed in vocationally relevant terms – that is, the report did not discuss how the degree of limitations assessed impacted Ms. Archuleta's

---

[12] The Social Security Administration rescinded SSR 96-5p effective March 27, 2017, only to the extent it is inconsistent with or duplicative of final rules promulgated related to Medical Source Opinions on Issues Reserved to the Commissioner found in 20 C.F.R. §§ 416.920b and 416.927 and applicable to claims filed on or after March 27, 2017. 82 Fed. Reg. 5844, 5845, 5867, 5869.

[13] These factors include the examining relationship, treatment relationship, length and frequency of examinations, the degree to which the opinion is supported by relevant evidence, the opinion's consistency with the record as a whole, and whether the opinion is that of a specialist. *See* 20 C.F.R. § 416.927(c)(2)-(6) (evaluating opinion evidence for claims filed before March 27, 2017).

ability to meet the mental demands of work. The record supports this finding (Tr. 884), and it is a legitimate basis for according the opinion less weight. *See* 20 C.F.R. 416.927(c)(3) (explaining that more weight will be accorded to medical opinion evidence that is better explained); *see also* 20 C.F.R. 416.945(c) (explaining that the nature and extent of mental limitations and restrictions are used to determine a residual functional capacity for work activity on a regular and continuing basis)[14]; POMS DI 24510.060.B.4.a. and B.4.b (explaining the difference between considering pertinent mental activities in light of a claimant's degree of limitation and the extent to which these mental capacities or functions could or could not be performed in work settings). Further, Ms. Archuleta presents no evidence that Dr. Hughson "used a form provided by DDS" such that the ALJ improperly accorded moderate weight on this ground. (Doc. 18 at 13.) To the contrary, the regulations inform a consultative examiner's report contents and elements and there is no suggestion therein that specific forms are provided to or required of consultative examiners.[15] *See* 20 C.F.R. 416.919n (informing the medical source of examination scheduling, report content, and signature requirements). To that end, the Administration provided Dr. Hughson with *Mental Status Consultative Examination Instructions,* and not a specific form, prior to Ms. Archuleta's scheduled exam.[16] (Tr. 876-77.) Second, the ALJ accurately noted that

---

[14] "Work-related mental activities generally required by competitive, remunerative work include the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." SSR 96-8p, 1996 WL 374174, at *6.

[15] In contrast, the form generally used by State agency nonexamining psychological consultants is quite specific. *See* POMS DI 24510.060 ("Because of the complexity of mental disorder evaluation, **a special Form SSA-4734-F4-SUP** is to be used to document the mental residual functional capacity (RFC) decision, i.e., what an individual can do despite his/her impairment.") (emphasis in original). Dr. Hughson's form varies significantly from Form SSA-4734-F4-SUP; *i.e.,* it contains only eleven mental function items; it includes two categories not found on the SSA form that address alcohol or other substances of abuse and whether a claimant can manage benefits; and it does not include sections for discussion of the evidence and for recording a mental RFC. (Doc. 884.)

[16] Therein, Dr. Hughson was instructed, *inter alia*, to "describe the claimant's ability to understand and remember basic instructions, concentrate and persist at tasks of basic work, interact with the general public and/or co-workers and adapt to changes in the work place." (Doc. 877.)

Dr. Hughson's findings were not informed by the greater variety of evidence that was available for review by the state agency consultants. (Tr. 884). The record supports the ALJ's finding in this regard, *see* Tr. 880 (no records were provided), and it is a legitimate explanation for according Dr. Hughson's opinion less weight. *See Thomas v. Berryhill*, 685 F. App'x 659, 662-63 (10th Cir. 2017) (unpublished)[17] (finding the ALJ properly accorded less weight to medical opinion where consultative examiner did not review the entire medical record); *see also* 20 C.F.R. 416.927(c)(6) (explaining that the extent to which a medical source is familiar with the other information in your case record is a relevant factor in deciding the weight to give a medical opinion). Finally, Ms. Archuleta has not argued or pointed to any evidence in the record, nor can the Court find any, to demonstrate that Dr. Hughson's assessed degree of limitations supported greater mental functional restrictions in the work setting than those assessed by the ALJ.[18]

For the foregoing reasons, the ALJ applied the correct legal standard in evaluating Dr. Hughson's opinion and provided legitimate reasons for the weight he accorded. As such, there is no reversible error as to this issue.

A. **State Agency Nonexamining Psychological Consultants Donald Gucker, Ph.D. and Ralph Robinowitz, Ph.D.**

On March 20, 2013, State agency nonexamining psychological consultant Donald Gucker, Ph.D., reviewed Ms. Archuleta's medical records and prepared a Psychiatric Review Technique[19] and a Mental Residual Functional Capacity Assessment ("MRFCA"). (Tr. 350,

---

[17] Unpublished decisions are not binding precedent in the Tenth Circuit, but may be cited for their persuasive value. *United States v. Austin*, 426 F.3d 1266, 1274 (10th Cir. 2005).

[18] Dr. Hughson's assessed moderate limitations mirror and are no more restrictive than those assessed by the State agency nonexamining psychological consultants. (Tr. 357, 374-75, 884.) There are no other medical source opinions in the Administrative Record related to Ms. Archuleta's ability to do work related mental activities.

[19] "The psychiatric review technique described in 20 CFR 416.920a and summarized on the Psychiatric Review Technique Form (PRTF) requires adjudicators to assess an individual's limitations and restrictions from a mental impairment(s) in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders

356-58.)  In Section I of the MRFCA, Dr. Gucker assessed that Ms. Archuleta was *not significantly limited* in her ability (1) to remember locations and work-like procedures; (2) to understand and remember very short and simple instructions; (3) to carry out very short and simple instructions; (4) to work in coordination with or in proximity to others without being distracted by them; (5) to make simple work-related decisions; and (6) to be aware of normal hazards and take appropriate precautions.  (Tr. 356-57.)  Dr. Gucker also assessed that Ms. Archuleta was *moderately limited* in her ability to (1) understand and remember detailed instructions; (2) to carry out detailed instructions; (3) to maintain attention and concentration for extended periods; (4) to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (5) to sustain an ordinary routine without special supervision; (6) to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (7) to respond appropriately to changes in the work setting; (8) to travel in unfamiliar places or use public transportation; and (9) to set realistic goals or make plans independent of others.  (*Id.*)  In Section III of the MRFCA, Dr. Gucker discussed Ms. Archuleta's Adult Function Report and Dr. Hughson's mental status exam.  (Tr. 358.) Dr. Gucker concluded that

> [c]laimant can understand, remember and carry out simple instructions, make simple decisions, attend and concentrate for extended periods, interact adequately with co-workers and supervisors, and respond appropriately to changes in the workplace.[20]

---

listings.  The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process."  SSR 96-8p, 1996 WL 374184, at *4.  Dr. Gucker rated Ms. Archuleta as having mild functional limitations in her activities of daily living, mild functional limitations in maintaining social functioning, moderate limitations in maintaining concentration, persistence or pace, and no episodes of decompensation. (Tr. 350.)

[20] This narrative tracks the mental activities generally required by competitive, remunerative, unskilled work.  *See* SSR 96-9p, 1996 WL 374185, at *9 (explaining that unskilled work generally requires the ability to understand,

(Tr. 358.)[21]  The ALJ, in turn, assessed that Ms. Archuleta could perform simple, routine tasks with few if any workplace changes.  (Tr. 298.)

Ms. Archuleta argues that the ALJ failed to account for *all* of Dr. Gucker's and Dr. Robinowitz's Section I moderate limitations in the RFC assessment, thereby engaging in inappropriate picking and choosing from their opinions.  (Doc. 18 at 14-17.)  The Commissioner contends that the ALJ appropriately relied on their Section III functional assessments and accounted for Ms. Archuleta's moderate limitations by limiting her to unskilled work.  (Doc. 21 at 12.)

Tenth Circuit case law requires ALJs to consider the entire MRFCA.  *See Nelson v. Colvin,* 655 F. App'x 626, 629 (10th Cir. 2016) (unpublished) (finding no reversible error regarding the ALJ's mental RFC assessment because the ALJ effectively accounted for *all* the limitations indicated in Section I of the MRFCA) (emphasis in original); *Lee v. Colvin*, 631 F. App'x 538, 541-42 (10th Cir. 2015) (finding no reversible error regarding the ALJ's RFC assessment because the ALJ did not ignore the Section I limitations and the RFC assessment reflected the moderate limitations identified in Section I of the MRFCA); *Carver v. Colvin*, 600 F. App'x 616, 619 (10th Cir. 2015) (unpublished) (explaining that an ALJ cannot turn a blind eye to moderate Section I limitations, and that if a consultant's Section III narrative fails to describe the effect of Section I limitations on a claimant's ability, or contradicts   certain Section I

---

remember and carry out simple instructions, make judgments that are commensurate with the functions of unskilled work – *i.e.,* simple work-related decisions; respond appropriately to supervision, co-workers and usual work situations; and deal with changes in a routine work setting); *see also* POMS DI 25020.010.B.3 (noting that the capacity to perform unskilled work includes ability to maintain attention for extended periods of two-hour segments but that concentration is "not critical").

[21] On September 23, 2013, nonexamining State agency psychological consultant Ralph Robinowitz, Ph.D., reviewed Ms. Archuleta's records at reconsideration.  (Tr. 376.)  Dr. Robinowitz noted the exact same Section I limitations as Dr. Gucker, and concluded in Section III that Ms. Archuleta was "capable of performing simple, detailed but non-complex work."  (*Id.*)

limitations, the MRFCA cannot properly be considered part of the substantial evidence supporting an ALJ"s RFC finding); *see also Smith v. Colvin*, 821 F.3d 1264, 1268-69 (10th Cir. 2016) (finding that an ALJ need not incorporate verbatim the moderate nonexertional limitations found in Section I if the ALJ incorporates the functional aspects of a claimant's nonexertional limitations assessed in Section III).[22]

The ALJ's RFC assessment sufficiently incorporated the functional aspects of Ms. Archuleta's nonexertional limitations assessed in Dr. Gucker's and Dr. Robinowitz's Section III narratives. Here, both consultants applied their Section I findings and concluded in Section III that Ms. Archuleta was functionally capable of unskilled work.[23] The MRFCA is therefore considered part of the substantial evidence supporting the ALJ's RFC assessment. *Carver*, 600 F. App'x at 619. In turn, although the ALJ's RFC assessment did not repeat verbatim Dr. Gucker's more detailed Section III narrative, the ALJ's RFC assessment nonetheless captured the essence of the consultants' Section III assessments. *Id.* at 620. For

---

[22] In *Smith v. Colvin*, the plaintiff argued that the ALJ erred in omitting moderate nonexertional impairments in assessing her RFC. Specifically, one evaluation found the plaintiff to be moderately limited in her ability to

- maintain concentration, persistence and pace,
- remain attentive and keep concentration for extended periods,
- work with other without getting distracted,
- complete a normal workday and workweek without interruption from psychologically based symptoms,
- perform at a consistent pace without excessive rest periods,
- accept instructions and respond appropriately to criticism by supervisors,
- get along with coworkers or peers without distracting them or engaging in behavioral extremes,
- respond appropriately to changes in the workplace, and
- set realistic goals or independently plan.

*Id.* at 1268. Applying these assessments from Section I of the MRFCA, the nonexamining State agency medical consultant found in Section III that the plaintiff could "(1) engage in work that was limited in complexity and (2) manage social interactions that were not frequent or prolonged." *Id.* The ALJ in *Smith* "arrived at a similar assessment," concluding that the plaintiff "could not engage in face to face contact with the public and could engage in only simple, repetitive and routine tasks." *Id.* at 1269. The Tenth Circuit found that, while the ALJ "did not repeat the moderate limitations assessed by the doctors" he sufficiently "incorporated these limitations by stating how the claimant was limited in the ability to perform work-related activities." *Id.* The Tenth Circuit also clarified that it is the narrative portion of the MRFCA form that controls the ALJ's assessment. *Id.* at n. 2.

[23] *See* fn. 20, *supra*.

example, Dr. Gucker addressed Ms. Archuleta's moderate limitations in understanding and memory and assessed that she could understand, remember and carry out only simple instructions and make simple decisions. (Tr. 358.) Dr. Robinowitz assessed that Ms. Archuleta could perform simple, detailed but non-complex work. (Tr. 376.) Similarly, the ALJ assessed that Ms. Archuleta could perform simple, routine tasks. (Tr. 298.) Dr. Gucker addressed Ms. Archuleta's moderate limitations in sustained concentration and persistence and nonetheless assessed that Ms. Archuleta could attend and concentrate for extended periods. (Tr. 358.) The ALJ accounted for Ms. Archuleta's moderate limitations in concentration, persistence and pace, and tempered Dr. Gucker's assessment by limiting her to unskilled work. *See Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012) (finding that an ALJ does not commit reversible error by electing to temper findings for the claimant's benefit); *see also Vigil v. Colvin*, 805 F.3d 1199, 1204 (10th Cir. 2015) (finding that limiting claimant to unskilled work with an SVP of only one or two adequately addressed moderate concentration, persistence, and pace problems);[24] *see also* POMS DI 25020.010.B.3 (noting that the capacity to perform unskilled work includes ability to maintain attention for extended periods of two-hour segments but that concentration is "not critical"). The ALJ also accounted for Dr. Gucker's assessment that Ms. Archuleta could interact adequately with co-workers and supervisors by limiting her to unskilled work.[25] Finally, where Dr. Gucker assessed that Ms. Archuleta could respond appropriately to changes in

---

[24] Although there may be cases in which an ALJ's limitation to "unskilled" work does not adequately address a claimant's mental limitations, *Chapo v. Astrue*, 682 F.3d 1285, 1290 n. 3 (10th Cir. 2012) (recognizing that restrictions to unskilled jobs do not in all instances account for the effect of mental impairments), the ALJ discussed elsewhere in his determination that Ms. Archuleta was able at both the consultative psychiatric examination and at the administrative hearing to understand and respond to questions appropriately, in a clear manner, and with relevant detail. (Tr. 297.) The ALJ also discussed that Ms. Archuleta did not report in her Adult Function Report that she had any difficulty with paying attention, understanding, or following instructions. (*Id.*) He further discussed that Dr. Hughson found Ms. Archuleta could perform the serial sevens task without error down to 72; that she was oriented to date, day, month, year, season, person, place, and time; and that she could repeat three words both immediately and after five minutes. (*Id.*)

[25] *See* fn. 20, *supra*.

routine work setting, the ALJ tempered this finding to Ms. Archuleta's benefit by limiting her to few, if any, workplace changes. *See Chapo*, 682 F.3d at 1288. Thus, Ms. Archuleta's argument that the ALJ engaged in inappropriate picking and choosing from Dr. Gucker's and Dr. Robinowitz's opinions fails. Additionally, Ms. Archuleta's argument that the ALJ should have accounted for *every* moderate limitation Dr. Gucker and Dr. Robinowitz assessed in Section I also fails because their Section III narratives adequately captured the limitations they found in Section I, and the ALJ's mental RFC adequately incorporated the functional aspects of a claimant's nonexertional limitations assessed in their Section III narratives. *Smith*, 821 F.3d at 1269. For these reasons, there is no reversible error as to this issue.

## C.     The ALJ's Step Five Findings Are Supported by Substantial Evidence

Ms. Archuleta argues that the ALJ's step five findings are not supported by substantial evidence because (i) the VE testimony regarding the number of jobs in the national economy is not reliable, and (ii) there is a conflict between the ALJ's RFC and the reasoning level requirement for the job of charge account clerk. (Doc. 18 at 18-22.)

At step five, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in the national economy. *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993); *Trimiar v. Sullivan*, 966 F.2d 1326, 1330 (10th Cir. 1992). The Commissioner meets this burden if the decision is supported by substantial evidence. *Thompson*, 987 F.2d at 1487.

### 1.     The ALJ Appropriately Relied on the VE's Testimony Regarding Whether a Significant Number of Jobs Exist in the National Economy

Ms. Archuleta asserts that the VE's methodology is unclear and that her extrapolation from the Occupational Employment Statistics Grouping-Standard Occupational Classification ("OES-SOC") system used by the Department of Labor to the DOT's classification of

occupations is "fraught with error." (Doc. 18 at 18-19.) In support, Ms. Archuleta points to a handful of district court cases to demonstrate inconsistent VE testimony regarding the number of jobs available for the jobs identified here. (*Id.* at 19.) For example, Ms. Archuleta states that in one case a VE testified there were 20,000 mail sorter jobs available in the national economy, while in this case Ms. Bowman testified there were 600,000. (*Id.*) Ms. Archuleta cites to another case in which the VE testified there were 15,000 jewelry sorter jobs available nationally, while in this case Ms. Bowman testified there were 30,000. (*Id.*) The Commissioner contends that Ms. Archuleta has failed to demonstrate that the inconsistency in job numbers has any relevance to the specific facts of her case. (Doc. 21 at 17-19.)

To determine whether jobs exist in significant numbers, regulations require the Commissioner to take administrative notice of reliable job information from various governmental and other publications. 20 C.F.R. 416.966(d). Among the publications the regulations identify is the *Dictionary of Occupational Titles*, published by the Department of Labor.[26] 20 C.F.R. § 416.966(d)(1). The Commissioner may also use the services of a vocational expert or other specialist to determine whether a claimant's work skills can be used in specific occupations. 20 C.F.R. § 416.966(e); *see also Rogers v. Astrue*, 312 F. App'x 138, 142 (10th Cir. 2009) (unpublished) (explaining that the whole point of vocational testimony is to go beyond facts already established through publications eligible for judicial or administrative notice and provide an alternative avenue of proof) (citing *Gay v. Sullivan*, 986 F.2d 1336, 1340 (10th Cir. 1993)).

---

[26] Other publications include the *County Business Patterns*, published by the Bureau of Census; *Census Reports*, also published by the Bureau of Census; *Occupational Analyses*, prepared for the Social Security Administration by various State employment agencies; and *Occupational Outlook Handbook*, published by the Bureau of Labor Statistics. 20 C.F.R. 416.966(d)(2)-(5).

Here, the ALJ utilized VE Pamela Bowman to determine whether jobs existed in the national economy for an individual with the claimant's age, education, work experience, and RFC. (Tr. 310, 335-41, 473-74.) Based on the ALJ's hypothetical, the VE identified three sedentary level jobs that Ms. Archuleta could perform, identified their DOT numbers, and testified, on the basis of her professional experience, regarding the number of available jobs in the national economy as to each of them. (Tr. 338.) When questioned, the VE affirmatively stated that her testimony was consistent with the DOT. (Tr. 339.) Although Ms. Archuleta asserts in her briefing that the VE erroneously extrapolated job numbers from the OES-SOC classification of occupations, there is nothing in the administrative hearing transcript to support Ms. Archuleta's assertion. And the Court will not assume facts that are not in the record. Additionally, Ms. Archuleta's reliance on VE testimony in other cases is misplaced given that the testimony cited involved different claimants, different facts, different hypotheticals, different vocational experts, and presumably different sources of information. Thus, Ms. Archuleta has failed to present any evidence that the VE was not qualified to testify in her professional capacity regarding the number of available jobs or that the DOT was not a reliable source. *Rogers*, 312 F. App'x at 142; 20 C.F.R. § 416.966(d) & (e). Further, Ms. Archuleta's non-attorney representative, when asked, had no objections to Ms. Bowman's qualifications as an expert. (Tr. 336.) As such, Ms. Archuleta has failed to demonstrate that it was improper for the ALJ to rely on the VE's testimony as substantial evidence. *See Rogers*, 312 F. App'x at 142 (explaining that ALJ could rely on VE testimony as substantial evidence where the VE testified based on professional experience, identified the number of jobs that existed in the national economy, and testimony addressed any conflicts between the claimant's exertional requirements and the jobs identified in the DOT).

**2.**     **The ALJ's Failure to Resolve the Conflict Between the VE's Testimony and the Job Description in the DOT for Charge Account Clerk Is Harmless Error**

Ms. Archuleta argues that one of the jobs the VE identified based on the ALJ's hypothetical, the charge-account clerk, requires a reasoning level that is incompatible with the ALJ's mental RFC limiting her to simple, work-related decisions.   (Doc. 18 at 20-22.) Ms. Archuleta relies on *Hackett v. Barnhart*, 395 F.3d 1168, 1176 (10th Cir. 2005), in which the Tenth Circuit found that a limitation to "simple routine work tasks" is more consistent with jobs requiring level two reasoning.  (*Id.* at 20.)   The charge account clerk is a level three reasoning job.  *See* DOT 205.367-014.   As such, Ms. Archuleta asserts there was an apparent conflict between the VE's testimony and the DOT that the ALJ had a duty to resolve.  (*Id.*)   The Commissioner contends that Ms. Archuleta's argument fails because "simple, work related decisions" relates to the specific vocational preparation (SVP)[27] rating in the DOT that describes the skill level required for a particular job, and that all three jobs the VE identified were unskilled.  (Id. at 20-22.)   The Commissioner explains that the reasoning level is part of the General Education Development (GED) framework and reflects the educational level necessary for satisfactory job performance and not the mental or skill requirements of the job.  (*Id.*)

The Commissioner contends that even assuming Ms. Archuleta's argument has merit, the ALJ identified two level two reasoning jobs in significant numbers thereby making any error harmless.  (Doc. 21 at 19-20.)

The Tenth Circuit has held that "an ALJ must investigate and elicit a reasonable explanation for any conflict between the Dictionary and expert testimony before the ALJ may

---

[27] "Specific Vocational Preparation is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  Dictionary of Occupational Titles – Appendix C – Components of the Definition Trailer, 1991 WL 688702 (2008).

rely on the expert testimony as substantial evidence to support a determination of nondisability."

*Haddock v. Apfel*, 196 F.3d 1084, 1091 (10th Cir. 1999). After the Tenth Circuit's holding in

*Haddock*, the Social Security Administration promulgated Social Security Ruling 00-4p and

further clarified the ALJ's affirmative responsibility to ask about conflicts. SSR 00-4p instructs

that

> [w]hen vocational evidence provided by a VE or VS is not consistent with
> information in the DOT, the [ALJ] must resolve this conflict before relying on the
> VE or VS evidence to support a determination or decision that the individual is or
> is not disabled. The [ALJ] will explain in the determination or decision how he or
> she resolved the conflict. The [ALJ] must explain the resolution of the conflict
> irrespective of how the conflict was identified.

SSR 00-4p, 2000 WL 1898704, at *4. In *Hackett,* the Tenth Circuit agreed with the claimant

that there was an apparent conflict between a claimant's inability to perform more than simple

and repetitive tasks and the level three reasoning required by the jobs identified. *Hackett*, 395

F.3d at 1176. The Court there remanded to allow the ALJ to address the conflict. *Id.*

The Commissioner argues that *Hackett* does not apply here because the Tenth Circuit did

not consider whether the apparent conflict at issue could be explained by the fact that GED

describes a job performer's educational background rather than the job's mental or skill

requirements. (Doc. 21 at 22.) The Court does not agree. The SVP level measures the skill

level necessary to perform a particular job; however, a claimant's skill level is not the only factor

an ALJ considers in determining whether there are jobs available in significant numbers in the

national economy that a claimant can do. 20 C.F.R. § 416.960(c)(1) (Commissioner considers

RFC and vocational factors of age, education, and work experience to decide whether claimant

can adjust to work). Thus, even acknowledging that the GED ratings generally correspond to a

person's level of formal and informal education that makes them suitable for a job, *Anderson v.*

*Colvin*, 514 F. App'x 756, 764 (10th Cir. 2013) (unpublished), a claimant's education is one

vocational factor that bears on the ALJ's ultimate determination of whether a claimant can adjust to other work at step five. Moreover, the Court is not persuaded that merely identifying jobs that are unskilled neutralizes or supplants the reasoning level conflict as the Commissioner argues. *See McHerrin v. Astrue*, 2010 WL 3516433, at *6, 156 Soc. Sec. Rep. Serv. 598 (E.D. Pa., Aug. 31, 2010) (explaining that a number of courts have found the DOT's reasoning levels are much more indicative of whether a claimant is capable of performing more than simple, repetitive tasks) (internal citations omitted)); *see also Chapo v. Astrue*, 682 F.3d 1285, 1290, at n. 3 (10th Cir. 2012) ("[w]hile the jobs cited by the VE happen to be unskilled, that just accounted for issues of skill transfer, not impairment of mental functions – which 'are not skills, but, rather, general prerequisites for most work at any skill level'" (quoting *Wayland v. Chater*, 76 F.3d 394 (10th Cir. 1996) (unpublished))); *see also Craft v. Astrue*, 539 F.3d 668, 677-78 (7th Cir. 2008) (holding that a limitation to unskilled work did not account for several effects of mental impairment); *Lucy v. Chater*, 113 F.3d 905, 909 (8th Cir. 1997) (explaining that many unskilled jobs require more than the mental capacity to follow simple instructions); *Cooper v. Barnhart*, 2004 WL 2381515, *4 (N.D. Ola. Oct. 15, 2004) (finding that a limitation to simple tasks appears more squarely addressed by a job's reasoning level, than to its SVP level, which focuses on vocational preparedness necessary to perform the job); SSR 85-15, 1985 WL 56867, at *6 ("Because response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the demands of the job. A claimant's condition may make performance of an unskilled job as difficult as an objectively more demanding job."). For these reasons, the Court declines to adopt the Commissioner's position that the GED reasoning levels can be disregarded when addressing the mental demands of jobs listed in the DOT and that identifying unskilled jobs eliminates any conflicts and accommodates a claimant's limitation to

do simple work.  The ALJ erred in failing to resolve the conflict between the VE's testimony and the job description for charge account clerk in the DOT.

The ALJ's error, however, is harmless.  *See Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004) (finding harmless error when the Court can confidently say that based on the material the ALJ considered that no reasonable administrative factfinder, following the correct analysis, could have resolved the actual matter in any other way).  Although Ms. Archuleta argues that the ALJ's failure to ask about the conflict should extend to the remaining two level two reasoning jobs the VE identified, the Court is not persuaded.  (Doc. 18 at 21-22.)  Ms. Archuleta cites to this Court's Memorandum Opinion and Order in *Gonzales v. Colvin*, USDC NM Civ. No. 14-835 KK, Doc. 24, wherein the Court expressed concern whether the claimant's limitation to simple work precluded her from doing even level two reasoning jobs.  (Doc. 18 at 21-22.)  In *Gonzales*, however, the record contained specific medical opinion testimony to support the Court's concern.  (USDC NM Civ. No. 14-835 KK, Doc. 24 at 22-24.)  That is not the case here.  To the contrary, Ms. Archuleta has not pointed to any evidence, nor can the Court find any, to support that Ms. Archuleta's limitation to simple, routine tasks precludes her from performing level two reasoning jobs.  *Hackett*, 395 F.3d at 1176.

The ALJ carried his burden at step five and identified a significant number of jobs that exist in the national economy that Ms. Archuleta can perform.  Even eliminating the number of available jobs for the charge account clerk, *i.e.,* 175,000, the VE identified 630,000 nationally available jobs in the aggregate, a number well above the number of jobs the Tenth Circuit has previously implied constitutes a significant number.  *See Rogers*, 312 F. App'x at 142 (implying that 11,000 nationally available jobs was a significant number); *Stokes v. Astrue*, 274 F. App'x 675 (10th Cir. 2008) (holding that no reasonable factfinder could determine that suitable jobs did

not exist in significant numbers where there were 11,000 regionally available jobs and 152,000 nationally available jobs).

For the foregoing reasons, the Court finds the ALJ's step five findings are supported by substantial evidence and there is no reversible error as to this issue.

### D.    Evaluation of Symptoms

Ms. Archuleta argues that the ALJ impermissibly evaluated her character instead of evaluating her symptoms.  (Doc. 18 at 22.)  She also argues that the ALJ failed to articulate specific reasons for questioning Ms. Archuleta's statements regarding the intensity, persistence, and limiting effects of her symptoms.  (*Id.* at 22-24.)  For example, she asserts that the ALJ mischaracterized her as "someone who plays, shops, and goes to parties on a daily basis," when she testified that her activities involve school-related activities with her daughter, that she shops on a less than weekly basis, and that her parents help her take care of her daughter.  (*Id.* at 23.) She further asserts that the ALJ improperly suggested that she is someone who would take advantage of the system because she is a single mother.  (*Id.*)  The Commissioner contends that the ALJ properly considered Ms. Archuleta's symptoms in the context of the record as a whole, and set forth specific evidence in his evaluation of Ms. Archuleta's statements regarding the intensity, persistence, and limiting effects of her symptoms during the insured period.  (Doc. 21 at 13-16.)

"Credibility determinations are peculiarly the province of the finder of fact, and [this court] will not upset such determinations when supported by substantial evidence." *Newbold v. Colvin*, 718 F.3d 1257, 1267 (10th Cir. 2013) (quotation omitted).  Although an ALJ "need not make a formalistic factor-by-factor recitation of the evidence" pertaining to a claimant's credibility, she should consider such facts as her daily activities, reactions to treatment,

"persistent attempts to find relief for her pain[,] . . . willingness to try any treatment prescribed, regular use of crutches or a cane, [and] regular contact with a doctor." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1167 (10th Cir. 2012). Here, the ALJ discussed Ms. Archuleta's extensive medical history and treatment, as well as her testimony and reported functional limitations. (Tr. 293-300.) The ALJ determined that Ms. Archuleta's statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely credible and explained that

> although the claimant alleges that her pain and fatigue leave her in a rather miserable state, and unable to sustain activities like sitting, standing, walking or bending well enough to work, these allegations are not entirely consistent with the wide range of activities like playing with her daughter and going out to shop and attend parties that she admits doing in daily life. Further, as the single mother of a young child, with plenty of duties as a result, the record suggests she may have another reason to be outside the work force, apart from disability. I have already noted many findings indicative of only mild limitations, such as good memory and concentration findings at her consultative mental examination, and entirely normal results in terms of strength, sensation, range of motion, gait and reflexes at her consultative physical examination. Although her treating sources have provided substantial care for pain, such as narcotics and injections, and there are scattered findings of greater severity, such as occasional synovitis, in no way do her treatment records reflect problems of the severity that would ordinarily cause the limitations she reports. Indeed, no treating source of medical care has suggested she is limited in performing any basic work activity. For all these reasons, I find her alleged symptoms and limitations to be only partially credible.

(Tr. 300.) The record supports these findings. (Tr. 198, 200-01, 324-25, 332, 609, 624, 720, 870-72, 882-83.) Elsewhere in his determination, the ALJ noted that Ms. Archuleta reported she prepares simple meals daily; performs chores, "with help" and as limited by pain, such as cleaning, dusting and laundry; drives and leaves home alone; shops independently for up to 90 minutes in a trip; and talks on the phone. (Tr. 296-97.) The record supports these findings. (Tr. 319, 324, 514-16, 525-27.) The record also demonstrates that Ms. Archuleta reported that she has no problems with her personal care, gets her daughter up for school, prepares her daughter's breakfast, takes her daughter to school, participates in her daughter's homework,

reads with her daughter, spends time on the computer, engages in moderate exercise regularly, visits family members, plays board games on the weekends, sometimes goes to movies, and enjoys swimming in the summer. (Tr. 156, 319-20, 324, 332, 512-16, 523-27, 584, 869.) Thus, the ALJ properly described the inconsistencies between Ms. Archuleta's statements regarding her alleged symptoms and the medical evidence and her activities of daily living. As such, the Court finds that the ALJ's findings are closely and affirmative linked to substantive evidence and not just a conclusion in the guise of findings. *Newbold*, 718 F.3d at 1267. The Court will not upset the ALJ's determination. *Id.*

That said, the Court has not ignored Ms. Archuleta's argument that it was improper for ALJ Weiss to consider her status as a single mother in evaluating her symptom testimony. (Doc. 18 at 22-23, Doc. 23 at 8.) The Court agrees that the ALJ's consideration of, and his assumption drawn because of Ms. Archuleta's status as single mother, is both troubling and inappropriate. The Court directs the ALJ to Social Security Ruling 16-3p, wherein the Administration lists the appropriate factors to consider in evaluating the intensity, persistence and limiting effects of an individual's symptoms. *See* SSR 16-3p, 2016 WL 1119029, at *7 (factors including daily activities; location, duration, frequency, and intensity of pain and other symptoms; factors that precipitate and aggravate the symptoms; type, dosage, effectiveness and side effects of any medication taken to alleviate pain or other symptoms; treatment, other than medication, for pain or other symptoms; any measures other than treatment used to relieve pain or other symptoms (i.e., lying flat on back, standing for 15 to 20 minutes every hour, or sleeping on a board); any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms). Despite the ALJ's improper consideration, however, the Court finds he provided, on balance, a valid basis for his findings. *See Pickup v. Colvin*, 606 F. App'x 430,

433-34 (finding that where part of ALJ's credibility analysis was incorrect, there was no reversible error because on balance it was proper and supported by substantial evidence).

### IV.  Conclusion

For the reasons stated above, Ms. Archuleta's Motion to Reverse and Remand for Rehearing (Doc. 18) is **DENIED.**

_____
**KIRTAN KHALSA**
**United States Magistrate Judge,**
**Presiding by Consent**